**PARRIS LAW FIRM**
R. Rex Parris, Esq. (SBN: 96567)
  rrex@parris.com
Alexander R. Wheeler, Esq. (SBN: 239541)
  alex@parris.com
Jason P. Fowler, Esq. (SBN: 239426)
  jason@parris.com
Edmond L. Guidry, IV, Esq. (SBN: 361230)
  eguidry@parris.com
43364 10th Street West
Lancaster, California 93534
Telephone: (661) 949-2595
Facsimile: (661) 949-7524
www.parris.com

*Attorneys for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| DINH TRAN, individually and on behalf of all others similarly situated, and DRIPPYS GOURMET ICE CREAM SANDWICHES, a California corporation, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>GKN AEROSPACE TRANSPARENCY SYSTEMS, INC., a California corporation; GKN AEROSPACE SERVICES LIMITED, a foreign corporation; MELROSE INDUSTRIES PLC, a foreign corporation; and DOES 1 through 100, inclusive,<br><br>                    Defendants. | **Case No. (CASE NO. TO BE ASSIGNED)**<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. Public Nuisance (Cal. Civ. Code §§ 3479, 3480, 3493);<br>2. Private Nuisance (Cal. Civ. Code § 3479);<br>3. Trespass;<br>4. Negligence;<br>5. Strict Liability for Ultrahazardous Activity;<br>6. Negligent Infliction of Emotional Distress.<br><br>**DEMAND FOR JURY TRIAL**<br><br>*[CAFA Jurisdiction; 28 U.S.C. § 1332(d)]* |

**CLASS ACTION COMPLAINT**

Plaintiff Dinh Tran, individually and on behalf of all others similarly situated, by and through undersigned counsel, and Plaintiff Drippys Gourmet Ice Cream Sandwiches ("Drippys"), individually, and on behalf of all others similarly situated, bring this Class Action Complaint against Defendants GKN Aerospace Transparency Systems, Inc., GKN Aerospace Services Limited, Melrose Industries plc, and DOES 1 through 100 (collectively, the "GKN Defendants" or "Defendants"), and alleges as follows:

## I.    INTRODUCTION

1.    On the afternoon of Thursday, May 21, 2026, a 34,000-gallon storage tank of methyl methacrylate at Defendants' aerospace manufacturing facility at 12122 Western Avenue in Garden Grove, California began overheating and venting toxic, flammable vapors into the surrounding community. The chemical at issue, methyl methacrylate, is a volatile, flammable monomer with a flash point near freezing that polymerizes exothermically once its stabilizing inhibitor is exhausted. Defendants stored tens of thousands of gallons of this extraordinarily dangerous chemical in a facility located against dense residential neighborhoods, schools, parks, and small businesses across six Orange County cities. Over the five days that followed, approximately 50,000 Orange County residents were ordered to evacuate from their homes, multiple schools were closed, businesses were shuttered, the Governor of California declared a state of emergency, and the President of the United States signed a federal emergency declaration. A catastrophic explosion was averted only through the sustained labor of public first responders working at significant personal risk over the holiday weekend. The mandatory-evacuation orders were lifted on the evening of Tuesday, May 26, 2026, but the harm to Plaintiffs and the proposed Classes — displacement, lost wages, lost business, lost school time, exposure, feared exposure, and emotional distress — had already occurred.

2.    By the next morning, the Orange County Fire Authority ("OCFA") had publicly declared that the tank "is going to fail." OCFA officials warned that the impending failure would come either as a several-thousand-gallon release of toxic chemicals into a residential corridor or as a thermal-runaway, boiling-liquid-expanding-

1

**CLASS ACTION COMPLAINT**

vapor explosion ("BLEVE") implicating two adjacent storage tanks. The on-scene division chief stated, on the record, that the incident was "the most significantly dangerous event" he had been part of in 32 years of service in the fire service.

3. Approximately 50,000 residents across Garden Grove, Anaheim, Stanton, Cypress, Buena Park, and Westminster were ordered to evacuate. The Garden Grove Unified School District closed multiple campuses. The Governor of California declared a state of emergency for Orange County. The President of the United States signed a federal emergency declaration. Families slept in shelters and the homes of friends and strangers; small businesses closed their doors; workers lost wages; schoolchildren lost instructional time; and an entire community was forced to flee a chemical hazard of Defendants' making.

4. Over the course of four days, firefighters and hazardous-materials specialists repeatedly entered an active blast radius to monitor the tank, to attempt to introduce a polymerization stabilizer, to cool the tank from the outside, and to confirm whether pressure was safely releasing through a crack that ultimately formed in the tank's shell. On Monday, May 25, 2026, OCFA Interim Fire Chief T.J. McGovern publicly stated that "the most catastrophic and worst-case scenario was mitigated and resolved." That outcome was achieved by the bravery and ingenuity of the men and women of the Orange County Fire Authority and its partner agencies. The harm to Plaintiffs and the proposed Class, including the displacement, lost wages, lost business opportunity, the lost school days, the loss of use and enjoyment of property, the emotional distress, and the exposure or feared exposure to a toxic monomer, had already occurred by the time the BLEVE threat was, at least for now, eliminated.

5. Defendants knew, or in the exercise of reasonable care should have known, that the tank required strict temperature control near 50 degrees Fahrenheit; that the chemical's polymerization inhibitor required continual maintenance and dissolved oxygen to function; that a single failure of the tank's cooling system, isolation valve, or off-loading apparatus would create a foreseeable and catastrophic risk to tens of thousands of people;

**CLASS ACTION COMPLAINT**

and that the placement of bulk methyl methacrylate storage immediately adjacent to residential communities required process-safety controls commensurate with the magnitude of foreseeable harm. But Defendants failed to adequately maintain the tank for, among others, in the following ways:

A.  Defendants failed to maintain the valve required to off-load the tank safely;

B.  Defendants failed to maintain a functional cooling system;

C.  Defendants failed to monitor and respond to the chemical's rising temperature; and

D.  Defendants chose to store an extraordinarily hazardous chemical in tens of thousands of gallons in a residential corridor for their own commercial benefit.

6.  Plaintiff Dinh Tran, on behalf of himself and all others similarly situated, brings this action to recover for the displacement, economic losses, property losses, loss of use and enjoyment of property, emotional distress, exposure, and other harms caused by Defendants' conduct, to recover punitive and exemplary damages for Defendants' despicable conduct carried on in willful and conscious disregard of the rights and safety of Plaintiffs and the proposed classes, and to obtain injunctive and declaratory relief ensuring that the conditions at the Garden Grove Facility that produced this near-catastrophe are remediated and not permitted to recur, including without limitation requiring Defendants to bring the Facility into full compliance with all applicable process-safety, hazardous-materials, and emergency-planning requirements before resuming ordinary operations.

7.  Plaintiff Drippys, on behalf of itself and all others similarly situated, brings this action to recover for the displacement of its business operations, economic losses, lost revenue, business interruption, loss of perishable inventory, loss of goodwill, property losses, loss of use and enjoyment of its commercial premises, and other harms caused by Defendants' conduct, to recover punitive and exemplary damages for Defendants'

3

**CLASS ACTION COMPLAINT**

despicable conduct carried on in willful and conscious disregard of the rights and safety of Plaintiffs and the proposed classes, and to obtain injunctive and declaratory relief ensuring that the conditions at the Garden Grove Facility that produced this near-catastrophe are remediated and not permitted to recur, including without limitation requiring Defendants to bring the Facility into full compliance with all applicable process-safety, hazardous-materials, and emergency-planning requirements before resuming ordinary operations.

## II.    JURISDICTION AND VENUE

8.    This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). The proposed Classes consist of more than one hundred members; the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and minimal diversity of citizenship exists in that Plaintiffs are citizens of the State of California and one or more Defendants is a citizen of a State or foreign state different from Plaintiffs. Defendant GKN Aerospace Transparency Systems, Inc. is a California corporation. Defendant GKN Aerospace Services Limited is a foreign corporation, and Defendant Melrose Industries plc is a foreign corporation.

9.    This Court also has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the claims over which this Court has original jurisdiction.

10.    This Court has personal jurisdiction over each Defendant. Each Defendant has continuous and systematic contacts with the State of California, transacts business in California, owns or operates real property in California, and committed or directed the tortious conduct alleged in this Complaint within California. Defendant GKN Aerospace Transparency Systems, Inc. owns or operates the manufacturing facility at 12122 Western Avenue, Garden Grove, California (the "Facility"). The remaining Defendants control, direct, and ratify the operations of the Facility, and at all relevant times participated in, controlled, or had the right to control the conduct alleged herein.

4

CLASS ACTION COMPLAINT

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District. The Facility is located in Garden Grove, Orange County, California, which lies within the Southern Division of this District. The mandatory evacuation orders, the school closures, the displacement of Plaintiffs and the proposed classes, and the property and economic harm alleged herein all occurred within Orange County.

### III.    PARTIES

**A.    Plaintiffs**

12. Plaintiff Dinh Tran is an individual residing in Stanton, County of Orange, State of California, at all times relevant to this Complaint. On the afternoon of Thursday, May 21, 2026, Plaintiff Tran returned to his residence on Winterwood Avenue in Stanton, California, approximately one mile from the Facility. He passed yellow caution tape at a service station on Beach Boulevard, the perimeter of what he later learned was the initial evacuation zone. Early on the morning of Friday, May 22, 2026, at approximately 4:00 a.m., Plaintiff Tran received a wireless emergency alert advising him to evacuate his home, although no instructions on where or how to evacuate were provided.

13. At approximately 6:00 a.m. on the same morning, Plaintiff Tran's landlord alerted him with the directive to pack and leave his home. Plaintiff Tran left his home with only his identification and the clothes on his back, and proceeded to the designated evacuation center. At approximately 11:00 a.m., authorities informed Plaintiff Tran and other evacuees at that center that the center itself was within the expanded mandatory evacuation zone and could not safely shelter them.

14. Plaintiff Tran found a friend willing to house him beginning on May 22, 2026, where he remained displaced through the evening of Tuesday, May 26, 2026, when the Orange County Fire Authority lifted all mandatory-evacuation orders. During his five days of displacement, Plaintiff Tran was unable to access his residence, his personal property, or his ordinary daily routines, and remained subject to a publicly acknowledged and sustained threat that a catastrophic explosion or toxic release might occur at any

**CLASS ACTION COMPLAINT**

moment.

15. As a direct and proximate result of Defendants' conduct, Plaintiff Tran has suffered damages including, without limitation, displacement and lodging costs; out-of-pocket expenses for transportation, food, and incidentals; loss of use and enjoyment of his residence; loss of personal-property access; emotional distress arising from a sustained, publicly acknowledged threat of explosion and toxic release; and exposure or feared exposure to methyl methacrylate vapor.

16. Plaintiff Drippys is a California corporation with its principal place of business at 12552 Western Avenue, Garden Grove, County of Orange, State of California, at all times relevant to this Complaint. Drippys operates a retail food and beverage business at premises located within the MAP Sports Facility ("MAP"), a youth and amateur sports venue at the same address. Drippys leases its commercial premises from MAP. The MAP Sports Facility is located approximately 0.4 miles from Defendants' Facility at 12122 Western Avenue, Garden Grove, well within every mandatory-evacuation zone declared by the Orange County Fire Authority and the City of Garden Grove in connection with the methyl methacrylate release.

17. On the evening of Thursday, May 21, 2026, Gary Thomas, the owner of Drippys, was notified by law enforcement that he was required to evacuate the business premises. Drippys was unable to operate for the five days that followed, from the evening of Thursday, May 21, 2026, through the evening of Tuesday, May 26, 2026, when the Orange County Fire Authority lifted all mandatory-evacuation orders. MAP itself was likewise required to shutter its doors throughout the Memorial Day weekend, cancelling numerous youth and amateur sporting events that had been scheduled at the facility over the holiday. Memorial Day weekend is historically one of MAP's largest revenue weekends of the year, and correspondingly one of Drippys' largest revenue weekends of the year, given Drippys' economic dependence on the foot traffic generated by MAP's sporting events.

18. As a direct and proximate result of Defendants' conduct, Drippys lost one of

6

**CLASS ACTION COMPLAINT**

its most valuable revenue weekends of the year. In addition, as a food and beverage business, Drippys was unable, during the five-day displacement period, to access its premises to preserve, relocate, or otherwise protect its perishable inventory, and accordingly suffered the foreseeable and predictable loss of that inventory.

**B.    Defendants**

19.    Defendant GKN Aerospace Transparency Systems, Inc. ("GKN Transparency") is, and at all relevant times has been, a California corporation with operations within the same. GKN Transparency owns or operates the Facility, where it designs, fabricates, tests, and certifies aircraft transparencies, including canopies and windows for military and commercial aircraft, using methyl methacrylate-based acrylic plastics manufacturing. GKN Transparency transacts business throughout California and has continuous and systematic contacts with this State.

20.    Defendant GKN Aerospace Services Limited is, and at all relevant times has been, a private limited company organized under the laws of England and Wales (Companies House No. 00355922), with its registered office at 11th Floor, The Colmore Building, Colmore Circus Queensway, Birmingham B4 6AT, England. GKN Aerospace Services Limited is the operating holding company for GKN Aerospace's global aerospace business. Plaintiffs are informed and believe, and on that basis alleges, that GKN Aerospace Services Limited is the direct or indirect parent of Defendant GKN Aerospace Transparency Systems, Inc., and that it directs or controls, or has directed or controlled, the operations of Defendant GKN Aerospace Transparency Systems, Inc., including the conditions at the Facility. The Secretary and a Director of Defendant GKN Aerospace Transparency Systems, Inc. maintains his business address at the registered office of GKN Aerospace Services Limited, reflecting the unity of management and control between the two entities. Defendant GKN Aerospace Services Limited transacts business in California through its direct or indirect ownership and control of Defendant GKN Aerospace Transparency Systems, Inc. ("GKN Transparency"), and has continuous and systematic contacts with this State sufficient to subject it to the personal jurisdiction

**CLASS ACTION COMPLAINT**

of this Court.

21.    Defendant Melrose Industries plc is, and at all relevant times has been, a public limited company organized under the laws of the United Kingdom. Melrose Industries plc is the ultimate parent of GKN Transparency and, as alleged below, is liable for the conduct of GKN Transparency under an alter-ego theory and as a joint participant in the conduct alleged herein.

22.    Plaintiffs are informed and believe and, on that basis, alleges that there exists, and at all relevant times has existed, such a unity of interest and ownership between Melrose Industries plc and GKN Aerospace Services Limited on the one hand, and GKN Transparency, on the other, that any separateness between them has ceased to exist, in that, among other things: (a) the parent company Defendants commingle funds and other assets with GKN Transparency; (b) the parent Defendants and GKN Transparency share common officers, directors, and managing agents; (c) GKN Transparency is undercapitalized in relation to the foreseeable magnitude of liability arising from the conduct alleged herein, including the displacement of tens of thousands of residents and the operation of a bulk-storage facility for an extraordinarily hazardous chemical; (d) the parent Defendants control the day-to-day operations of GKN Transparency through shared environmental, health, safety, and process-safety policies, shared insurance programs, and shared corporate-level management of high-hazard manufacturing operations; (e) the parent Defendants treat GKN Transparency as a mere instrumentality, division, or department of themselves, and the public has been led to believe, through Defendants' own corporate communications, that the GKN Defendants constitute a single integrated aerospace enterprise; and (f) the parent Defendants authorized, directed, ratified, and approved the practices and conditions at the Facility that gave rise to the conduct alleged herein.

23.    Adherence to the fiction of separate corporate existence among the GKN Defendants would, under the circumstances alleged herein, sanction fraud and promote injustice. The parent Defendants would otherwise be permitted to insulate themselves

8

**CLASS ACTION COMPLAINT**

from liability for the consequences of operations they direct, profit from, and control, by interposing an operating subsidiary that on information and belief lacks the capital to satisfy a judgment flowing from the magnitude of the harm caused, leaving Plaintiffs and the proposed classes without a meaningful remedy for the displacement of an entire community.

24.    At all times relevant herein, each Defendant was the agent, employee, partner, joint venturer, alter ego, and co-conspirator of each other Defendant, and was acting within the course, scope, and authority of such relationship. Each Defendant authorized, ratified, and approved the acts and omissions of each other Defendant named herein.

25.    The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1 through 100, inclusive, are unknown to Plaintiff at this time, who therefore sues said Defendants by such fictitious names. Plaintiffs are informed and believe and, on that basis, alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences and injuries alleged herein, and that Plaintiff's damages were proximately caused by the conduct of said Defendants. The fictitiously named Defendants include, without limitation: the supplier or manufacturer of the methyl methacrylate inventory stored at the Facility; the manufacturer of the storage tank, refrigeration and cooling system, and isolation and off-loading valves; the engineering firm of record for the bulk-storage system; contractors retained by Defendants to inspect, service, or maintain the tank, valves, cooling system, or polymerization-inhibitor system; and individual officers, directors, managing agents, and employees of the GKN Defendants who directed, authorized, or ratified the conduct alleged herein. Plaintiffs will seek leave to amend this Complaint to allege the true names and capacities of said Defendants when ascertained.

## IV.    FACTUAL ALLEGATIONS

**A.    The Facility and Its Operations**

26.    The GKN Defendants own and operate a 15.5-acre manufacturing facility at

9

CLASS ACTION COMPLAINT

12122 Western Avenue, Garden Grove, Orange County, California. The GKN Defendants have occupied the Facility since 2004. At the Facility, the GKN Defendants design, fabricate, test, and certify aircraft transparencies, including canopies and windows for military and commercial aircraft, using methyl methacrylate-based acrylic plastics manufacturing.

27.    The Facility is bordered by dense residential housing, schools, parks, and commercial corridors across multiple Orange County municipalities, including Garden Grove, Anaheim, Stanton, Cypress, Buena Park, and Westminster. Wakeham Elementary School, an Orange County public school serving children in transitional kindergarten through sixth grade, sits less than 1,500 feet east of the Tank and falls within both the moderate-damage radius and the mandatory-evacuation zone established during the incident. The Magic Lamp Mobile Home Community lies immediately south of the Facility within the same zone. Single-family residential housing begins within several hundred feet of the Tank in every direction.

28.    To support its acrylic-plastics operations, the GKN Defendants store methyl methacrylate (Chemical Abstracts Service No. 80-62-6) at the Facility in bulk quantities, including in at least one tank with a capacity of approximately 34,000 gallons (the "Tank") and at least two additional adjacent storage tanks.

**B.    Methyl Methacrylate Is a Foreseeably Catastrophic Hazard**

29.    Methyl methacrylate is a colorless, volatile, flammable liquid monomer used to produce acrylic polymers. Its physical and chemical properties make it one of the most hazardous bulk-storage commodities used in industrial manufacturing.

30.    Methyl methacrylate has a flash point of approximately 36 degrees Fahrenheit. It is ignitable at ambient conditions throughout most of California for most of the year.

31.    Methyl methacrylate is self-polymerizing, and the polymerization reaction is exothermic. Once the reaction begins, it generates additional heat, which accelerates the reaction, in a self-reinforcing chain reaction that cannot be stopped by ordinary fire-

10

**CLASS ACTION COMPLAINT**

suppression measures.

32.     To prevent runaway polymerization during storage, methyl methacrylate is stabilized by the addition of a small amount of a polymerization inhibitor (commonly the monomethyl ether of hydroquinone, or "MEHQ"). The inhibitor requires dissolved oxygen in the liquid to function. As the temperature of the stored chemical rises, dissolved oxygen is driven off, the inhibitor stops working, and the chemical proceeds to a self-sustaining polymerization reaction.

33.     The recommended storage temperature for methyl methacrylate is approximately 50 degrees Fahrenheit. At temperatures meaningfully above that range, the risk of inhibitor failure and runaway polymerization increases markedly.

34.     Exposure to methyl methacrylate vapor causes, among other effects, irritation of the skin, eyes, and respiratory tract; respiratory distress; and, at higher concentrations, severe respiratory effects requiring hospitalization. The long-term human-health effects of community-scale ambient exposure to methyl methacrylate are not well characterized in the scientific literature, a fact that itself supports the need for medical monitoring of exposed populations.

35.     By virtue of these properties, the bulk storage of methyl methacrylate in quantities of tens of thousands of gallons, in proximity to dense residential populations, is a recognized high-hazard industrial activity that requires, at a minimum: (i) a working refrigeration and cooling system maintained continuously at the chemical's recommended storage temperature; (ii) functional isolation and off-loading valves that allow the contents to be safely removed in the event of a process upset; (iii) ongoing maintenance of inhibitor concentration and dissolved oxygen in the stored liquid; (iv) continuous temperature monitoring with alarms calibrated to trigger long before a runaway reaction can begin; (v) operator training adequate to recognize and respond to temperature excursions; and (vi) compliance with the process-safety, hazardous-materials, and emergency-planning regimes that California and federal law impose on operators of facilities storing such chemicals.

**CLASS ACTION COMPLAINT**

## C.   The Incident

36.   At approximately 3:30 p.m. on Thursday, May 21, 2026, the Orange County Fire Authority was dispatched to the Facility for a leaking 34,000-gallon storage tank of methyl methacrylate.

37.   The Tank's internal temperature had risen substantially above the chemical's recommended storage temperature, reaching at least 95 degrees Fahrenheit, approximately 45 degrees above recommended storage conditions, by Thursday afternoon. The Tank's pressure-relief mechanism and the Facility's automated overhead sprinkler and deluge system activated, venting methyl methacrylate vapors into the surrounding atmosphere.

38.   Defendants and emergency responders attempted to off-load the Tank's contents to relieve the danger. They were unable to do so because the valve required to off-load the contents was inoperable, gummed up, or otherwise damaged. The Tank could not be safely emptied through its intended off-load mechanism.

39.   Cooling efforts also failed. Plaintiffs are informed and believe and on that basis alleges that the cooling system on at least one of the Facility's methyl methacrylate tanks had been compromised before the incident began, allowing the chemical's storage temperature to exceed safe limits.

40.   Emergency responders concluded that they could not drill into the Tank to relieve pressure, because the friction and heat generated by drilling into the thick steel of the Tank itself created a foreseeable risk of igniting the volatile chemical inside.

41.   On the evening of Friday, May 22, 2026, emergency crews entered the Facility and attempted to introduce a chemical stabilizer to harden the contents of the methyl methacrylate tanks. They successfully added the stabilizer to two adjacent tanks. They were not able to add the stabilizer to the unstable Tank before being forced to leave the area because of higher-than-expected temperatures.

42.   On the public record, OCFA Division Chief Craig Covey stated that the Tank "is going to fail." He predicted two possible failure modes: a rupture and release of approximately 6,000 to 7,000 gallons of methyl methacrylate, or a thermal-runaway,

12

<strong>CLASS ACTION COMPLAINT</strong>

boiling-liquid-expanding-vapor explosion endangering the two adjacent storage tanks. He further stated, on the record, that the incident was "the most significantly dangerous event" he had been part of in 32 years of service.

43.    On Sunday, May 24, 2026, OCFA Interim Fire Chief T.J. McGovern stated that crews planned an overnight reconnaissance operation to determine whether pressure inside the compromised Tank was being safely released.

44.    On Monday, May 25, 2026, OCFA officials announced that a crack had formed in the Tank's shell, allowing pressure to safely release; that the temperature of the Tank had begun to decrease; and that the threat of a BLEVE was, in the words of Incident Commander Craig Covey, "now off the table." Interim Fire Chief McGovern publicly stated: "The most catastrophic and worst-case scenario was mitigated and resolved. . . . It's not over yet, and I want to re-emphasize that. It's not over yet. We still have work to do."

45.    Plaintiffs are informed and believe and, on that basis, alleges that the at least temporary elimination of the BLEVE threat was the product of sustained, dangerous, and innovative work by OCFA crews and their partner agencies, including the removal of weather insulation from the outside of the Tank to allow water-cooling to function more efficiently and an overnight reconnaissance operation into the active hazard area, and was not the product of any corrective action by the GKN Defendants.

46.    On the evening of Tuesday, May 26, 2026, the Orange County Fire Authority lifted all mandatory-evacuation orders connected with the incident. OCFA Interim Fire Chief T.J. McGovern stated that the agency would continue to monitor the Tank as crews removed the deluge system and external sprinkler system in stages and observed the Tank's temperature response. The cause of the Tank's overheating remains under investigation; in McGovern's own words, "we don't know why, but it stopped cooling . . . we're just now being able to get to the tanks, so there's definitely more to come of what caused it." Western Avenue between Chapman Avenue and Garden Grove Boulevard remained closed to ordinary traffic as of the filing of this Complaint. The Facility's

13
**CLASS ACTION COMPLAINT**

underlying conditions — the inoperable valve that prevented safe off-load, the compromised cooling system, the inadequate process-safety controls that allowed the Tank to reach a temperature near 100 degrees Fahrenheit before intervention, and Defendants' storage of bulk quantities of methyl methacrylate immediately adjacent to homes, schools, and small businesses — remain in place.

**D.    The Evacuation**

47.    On Thursday, May 21, 2026, in the evening, the Orange County Fire Authority and the City of Garden Grove issued mandatory evacuation orders covering the area bounded by Garden Grove Boulevard on the north, Monarch Street on the east, Orangewood Avenue on the south, and Beach Boulevard on the west. Those initial evacuation orders were lifted Thursday night.

48.    On Friday, May 22, 2026, at approximately 6:30 a.m., the Orange County Fire Authority reissued and substantially expanded the evacuation orders after responders discovered that the inoperable valve prevented the Tank from being safely off-loaded. The expanded mandatory-evacuation zone ran north of Trask Avenue, south of Ball Road, east of Valley View Street, and west of Dale Street, and covered portions of Garden Grove, Anaheim, Cypress, Stanton, Buena Park, and Westminster.

49.    Approximately 50,000 residents were displaced under the mandatory-evacuation orders. The Garden Grove Unified School District closed multiple campuses. Congregate shelters were opened at the Garden Grove Sports and Recreation Center, the Cypress Recreation and Community Center, and Ocean View High School in Huntington Beach. At least one designated shelter, in Stanton, was itself found to be within the expanded evacuation zone, and evacuees who had reported there were required to relocate again.

50.    The Governor of California declared a state of emergency for Orange County in connection with the incident. The President of the United States signed a federal emergency declaration in response to the request submitted by the State of California.

/ / /

14

**CLASS ACTION COMPLAINT**

51.    On the evening of Monday, May 25, 2026, OCFA reduced but did not lift the mandatory-evacuation zone. The reduced zone, bounded by Orangewood Avenue on the north, Dale Street on the east, Knott Street on the west, and Garden Grove Boulevard on the south, continued to encompass approximately 16,000 residents. On the evening of Tuesday, May 26, 2026, OCFA lifted all remaining mandatory-evacuation orders and announced that no threat of fire, explosion, or risk to the public remained. In total, mandatory-evacuation orders connected to the incident were in effect for approximately five days, from the afternoon of Thursday, May 21, 2026, through the evening of Tuesday, May 26, 2026.

**E.    The Harm to Plaintiffs and the Proposed Classes**

52.    The conditions at the Facility caused severe harm to Plaintiffs and the proposed Class. That harm included, without limitation: (a) the involuntary displacement of tens of thousands of residents from their homes, and the involuntary closure and inaccessibility of business premises within the evacuation zones, for a period of up to five days; (b) the loss of use and enjoyment of homes, business premises, schools, and public spaces within the evacuation zones during the period of displacement; (c) out-of-pocket expenses for lodging, food, transportation, and incidentals incurred during displacement; (d) lost wages for workers unable to reach their workplaces or whose workplaces fell within the evacuation zones; (e) lost business revenue, business interruption losses, the loss of perishable inventory, and lost goodwill for businesses within the evacuation zones, including the loss of revenue from holiday-weekend operations that businesses within the zones had planned for and on which they economically depended; (f) lost instructional time and additional childcare expenses arising from school closures; (g) interference with possessory and use rights in real property, including commercial leaseholds; (h) exposure, or feared risk of exposure, to methyl methacrylate vapor and to the foreseeable products of a thermal-runaway event involving methyl methacrylate; and (i) emotional distress, on the part of natural-person Plaintiffs and Class members, arising from a sustained, publicly acknowledged threat of explosion and toxic release that was averted but only through

15

**CLASS ACTION COMPLAINT**

public emergency response, not through Defendants' own corrective action.

**F.     Defendants' Knowledge and Notice**

53.     Defendants knew, or in the exercise of reasonable care should have known, of the dangerous condition of the Tank and the Facility, and of the foreseeable risk of catastrophic release, before the conditions at the Facility caused the evacuation alleged herein.

54.     Upon information and belief, the Facility has been the subject of multiple Cal/OSHA inspections, which produced citations and findings for safety violations at the Facility.

55.     Defendants and their corporate affiliates have a history of regulatory enforcement involving the storage and handling of ignitable and hazardous chemicals at GKN Aerospace facilities, including, on information and belief, prior federal enforcement actions involving the storage of ignitable hazardous waste at a GKN Aerospace facility in El Cajon, California, and a prior explosion-and-fire incident at a GKN Aerospace facility in Amityville, New York.

56.     The physical and chemical properties of methyl methacrylate that make bulk storage of the chemical inherently dangerous, including its low flash point, its exothermic self-polymerization, and the limitations of polymerization inhibitors, all of which are dangers well known throughout the chemical-manufacturing and process-safety industries, and are documented in publicly available regulatory and industry-association literature. Defendants knew or should have known of these hazards by virtue of their decision to engage in the bulk storage of methyl methacrylate at the Facility.

57.     Defendants' chosen location of the Facility, immediately adjacent to dense residential housing, schools, parks, and commercial corridors, made the consequences of any process upset reasonably foreseeable as harms to the very residents and businesses that have been displaced.

/ / /

/ / /

16

**CLASS ACTION COMPLAINT**

**G.    Industry-Wide Knowledge of Methyl Methacrylate Runaway Hazards and Defendants' Conscious Disregard of Those Hazards**

58.    The risk of catastrophic thermal-runaway polymerization of monomers like methyl methacrylate, including the precise failure mode that occurred at the Facility — inhibitor depletion in a heated and pressurized storage tank, leading to an exothermic chain reaction and the risk of a boiling-liquid-expanding-vapor explosion—has been documented in publicly available scientific, industrial, and regulatory literature for decades. The chemical industry, including operators of bulk methyl methacrylate storage facilities, has long been on notice of this hazard. A statistical study published in ACS Omega, drawing on U.S. Chemical Safety and Hazard Investigation Board data for incidents involving uncontrolled chemical reactions in the United States between 1980 and 2001, reported that approximately fifteen percent of such incidents were thermal-runaway events involving the rapid polymerization of a monomer. These events have caused fatalities and serious injury throughout the period.

59.    In 2002, the United States Chemical Safety and Hazard Investigation Board issued a report following two reactive-chemical accidents in New Jersey in the 1990s, one of which killed five workers, calling on industry to "improve the management of reactive hazards" and concluding that "reactive incidents are a significant chemical safety problem." In 2012, a runaway polymerization of acrylic acid in an intermediate storage tank at the Nippon Shokubai chemical plant in Himeji, Japan, caused an explosion and chemical fire that killed one worker and injured thirty-six others. In 2020, a thermal runaway of styrene at the LG Polymers plant in Visakhapatnam, India, killed twelve people and injured more than five hundred and eighty; a committee appointed by India's top environmental court attributed the disaster to "gross human failure" and a lack of basic safety norms. In 2023, a study published in the peer-reviewed journal Thermochimica Acta specifically urged that more attention be paid to methyl methacrylate runaway hazards, observing that "[t]he correct choice of operating conditions often constitutes the first line of defense against thermal runaway events" and warning that, without proper

17

**CLASS ACTION COMPLAINT**

hazard evaluation and process design, "the highly exothermic nature of the reaction may pose a severe threat to process safety as well as to industrial-scale equipment and to human lives."

60. The specific engineering and process-safety controls required to prevent methyl methacrylate runaway polymerization — continuous refrigeration and cooling, functional isolation and off-load valves maintained against the known failure mode of localized polymer formation, monitoring of inhibitor concentration and dissolved oxygen, automated temperature monitoring with alarms calibrated to trigger well before a runaway reaction can begin, and a process-safety management program adequate to the hazard — are not experimental. They are well-understood, well-documented, and uniformly recognized throughout the chemical-process-safety community.

61. Defendants are sophisticated operators of bulk methyl-methacrylate storage and acrylic-plastics manufacturing. Defendants have operated the Facility since 2004. Defendants knew or, in the exercise of any reasonable care, should have known of every category of hazard documented in the literature described above and of every engineering control required to manage that hazard. Despite that knowledge, Defendants operated the Facility with an isolation and off-loading valve that was inoperable, gummed up, or otherwise damaged on the day of the incident; with a cooling system that, on the information presently available, failed for reasons Defendants themselves cannot yet explain; and without a process-safety management system adequate to detect a rising temperature in the Tank before the Tank's pressure-relief mechanism vented toxic flammable vapor into the surrounding community. The proximate predecessor of this incident — a rising tank temperature — occurred on a measurable trend line of approximately one degree per hour, the sort of slow progression that a competent process-safety monitoring program is designed to catch hours or days before any release. Defendants' officers, directors, and managing agents knew of or recklessly disregarded the conditions that gave rise to this incident. Defendants' officers, directors, and managing agents authorized, ratified, and approved the practices and conditions at the Facility that

18

**CLASS ACTION COMPLAINT**

gave rise to the conduct alleged herein. Defendants' conduct constitutes despicable conduct carried on in willful and conscious disregard of the rights and safety of Plaintiffs and the proposed classes within the meaning of California Civil Code section 3294.

## V.    CLASS ACTION ALLEGATIONS

62.    Plaintiffs bring this action, individually and on behalf of all others similarly situated, as a class action under Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). In the alternative, and without prejudice to the class allegations set forth herein, Plaintiffs intend to proceed by permissive joinder under Federal Rule of Civil Procedure 20.

63.    Individual Class Definition. Plaintiff Tran brings this action on behalf of himself and a class (the "Individual Class") of similarly situated persons defined as: All natural persons who, at any time between May 21, 2026, and May 26, 2026, resided in, operated a business in, were employed at a workplace located in, or attended school at a campus located within any mandatory-evacuation zone declared by the Orange County Fire Authority or the City of Garden Grove in connection with the methyl methacrylate release at GKN Aerospace's facility at 12122 Western Avenue, Garden Grove, California. Excluded from the Individual Class are Defendants; the officers, directors, employees, and agents of Defendants; the Court and its staff; and all members of the Court's immediate family.

64.    Business Class Definition. Plaintiff Drippys Gourmet Ice Cream Sandwiches brings this action on behalf of itself and a class (the "Business Class") of similarly situated business entities defined as: All business entities that, at any time between May 21, 2026, and May 26, 2026, owned, operated, leased, or held a possessory interest in commercial premises located within any mandatory-evacuation zone declared by the Orange County Fire Authority or the City of Garden Grove in connection with the methyl methacrylate release at GKN Aerospace's facility at 12122 Western Avenue, Garden Grove, California. Excluded from the Business Class are Defendants; the officers, directors, employees, and agents of Defendants; the Court and its staff; and all members of the Court's immediate

**CLASS ACTION COMPLAINT**

family.

65. Numerosity. Federal Rule of Civil Procedure 23(a)(1). The Class consists of tens of thousands of individuals and an additional number of business entities. Approximately 50,000 residents were displaced under the mandatory-evacuation orders during the most severe period of the incident, and approximately 16,000 residents remain displaced under the reduced evacuation zone as of the filing of this Complaint. Joinder of all Class members is impracticable. The precise number and identities of Class members are readily ascertainable from public records of the evacuation orders, residential and business registration records, school-district records, and Defendants' own records of their facility and the response.

66. Commonality. Federal Rule of Civil Procedure 23(a)(2). There are questions of law and fact common to all Class members, including, without limitation: (a) whether Defendants owned, operated, controlled, or directed the operation of the Facility and the Tank; (b) whether Defendants knew or should have known of the dangerous condition of the Tank, the inoperable valve, the compromised cooling system, and the inadequacy of inhibitor maintenance; (c) whether Defendants' conduct constitutes a public nuisance, a private nuisance, a trespass, negligence, or an ultrahazardous activity giving rise to strict liability under California law; (d) whether Defendants violated applicable statutes and regulations governing the storage of flammable and hazardous chemicals; (e) whether Defendants' conduct caused the mandatory-evacuation orders; (f) whether Defendants are liable for the categories of damages suffered by the Classes; and (g) whether Plaintiffs and the Classes are entitled to injunctive relief abating the remaining dangerous condition at the Facility.

67. Typicality. Federal Rule of Civil Procedure 23(a)(3). Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs and all Class members were subjected to the same conduct by Defendants, were displaced under the same evacuation orders, and suffered the same categories of damages arising from the same chemical release and the same Facility.

**CLASS ACTION COMPLAINT**

68.    Adequacy. Federal Rule of Civil Procedure 23(a)(4). Plaintiffs will fairly and adequately represent the interests of the Classes. Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the Classes. Plaintiffs have retained PARRIS Law Firm, counsel competent and uniquely experienced in both complex class-action and environmental tort litigation, and which is therefore well qualified to serve as Class Counsel under Federal Rule of Civil Procedure 23(g).

69.    Predominance and Superiority. Federal Rule of Civil Procedure 23(b)(3). The questions of law and fact common to Class members predominate over questions affecting only individual Class members. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Among other reasons: (a) the conduct alleged is uniform across the Class and arises from a single source, the same Facility and the same release event; (b) the cost of individually litigating each Class member's claim would be prohibitive relative to the recovery available to most Class members; (c) classwide adjudication will conserve judicial resources and avoid the risk of inconsistent adjudications; and (d) classwide treatment will allow the use of formulaic damages models for economic losses including displacement-period expenses and loss-of-use damages, which are amenable to classwide proof even though some individualized proof may be required for certain categories of personal-injury damages.

70.    Injunctive Relief Classwide. Federal Rule of Civil Procedure 23(b)(2). Defendants have acted and refused to act on grounds generally applicable to the Classes, making injunctive and corresponding declaratory relief appropriate respecting the Classes as a whole. The Classes share a common interest in ensuring that the underlying conditions at the Facility that produced this near-catastrophe — including Defendants' storage of bulk quantities of methyl methacrylate without adequate process-safety controls, without functional isolation and off-loading apparatus, and without functional cooling — are remediated before Defendants resume ordinary operations, and that the Facility is brought into full compliance with applicable process-safety, hazardous-materials, and emergency-planning requirements.

21

**CLASS ACTION COMPLAINT**

# VI.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

*Public Nuisance, Cal. Civ. Code §§ 3479, 3480, 3493*

*(By Plaintiffs and the Class Against All Defendants)*

71.    Plaintiffs reallege and incorporate by reference each and every allegation set forth above as if fully set forth herein.

72.    A public nuisance is anything that is injurious to health, indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, and that affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal. (Cal. Civ. Code §§ 3479, 3480.)

73.    By their acts and omissions in connection with the Facility, the Tank, the inoperable valve, the compromised cooling system, the inadequately maintained polymerization-inhibitor system, the failure to monitor and control the chemical's temperature, and the location and operation of a bulk methyl methacrylate storage facility immediately adjacent to dense residential housing, schools, parks, and businesses, Defendants created and maintained a condition that is injurious to public health, offensive to the senses, and an obstruction to the free use of property in the affected communities.

74.    Defendants' conduct interfered with rights common to Plaintiffs and the Proposed Classes, including their rights to the safe use and enjoyment of their homes and places of business, their right to attend school and use public spaces, their right to breathe air free of toxic vapor, and their right to be free from the imminent threat of explosion and toxic release.

75.    Defendants' conduct is unreasonable. The bulk storage of an extraordinarily flammable, self-polymerizing chemical in a residential corridor, without functional isolation valves, without functional cooling, and without adequate process-safety controls, is unreasonable in light of the foreseeable risk and the magnitude of the harm.

22

**CLASS ACTION COMPLAINT**

76.    The interference is substantial and unreasonable. The Proposed Classes are made up of approximately 50,000 residents across six cities who were forced to leave their homes and businesses for periods ranging up to five days. Multiple schools were closed. The Governor declared a state of emergency. The President signed a federal emergency declaration.

77.    Plaintiffs have suffered, and each member of the Proposed Classes also suffers, harm of a kind different from that suffered by the general public, including specific interference with possessory rights in their respective residences or commercial premises, and specific personal exposure or feared exposure to methyl methacrylate vapor. These special injuries entitle Plaintiffs to maintain this action under California Civil Code section 3493.

78.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Classes have suffered, and continue to suffer, damages in an amount to be proven at trial, including without limitation: evacuation and displacement costs; lodging, food, transportation, and incidental expenses; lost wages and lost business income; loss of use and enjoyment of property; property damage and diminution in property value; medical expenses incurred in connection with exposure or feared exposure; the reasonable costs of medical monitoring for the latent effects of exposure to methyl methacrylate; school-closure-related costs; and emotional distress.

79.    The conditions at the Facility constitute a nuisance the underlying conditions of which have not been remediated. Plaintiffs and the Classes are entitled to preliminary and permanent injunctive relief requiring Defendants to bring the Facility into compliance with all applicable process-safety, hazardous-materials, and emergency-planning requirements before resuming ordinary operations involving the bulk storage of methyl methacrylate or other hazardous chemicals.

80.    In addition, Defendants' conduct giving rise to the public nuisance was carried on with malice within the meaning of California Civil Code section 3294(c)(1), in that it constituted despicable conduct carried on by Defendants with a willful and

23

**CLASS ACTION COMPLAINT**

conscious disregard of the rights and safety of Plaintiffs and the proposed classes. As set forth above, Defendants knew of the well-documented risks of thermal-runaway polymerization of methyl methacrylate, knew or had every reason to know that their cooling system, isolation valves, inhibitor maintenance, and temperature-monitoring systems were inadequate to manage those risks, and nonetheless stored tens of thousands of gallons of methyl methacrylate in a residential corridor for their own commercial benefit. This conduct was authorized, ratified, and approved by Defendants' officers, directors, and managing agents within the meaning of California Civil Code section 3294(b). Plaintiffs and the Classes are entitled to punitive and exemplary damages on this cause of action.

## SECOND CAUSE OF ACTION

*Private Nuisance, Cal. Civ. Code § 3479*

*(By Plaintiffs and the Classes Against All Defendants)*

81.     Plaintiffs reallege and incorporate by reference each and every allegation set forth above as if fully set forth herein.

82.     Plaintiffs and the members of the Classes own or possess real property within the mandatory-evacuation zones, or are tenants, employees, students, or business operators with lawful possessory or use rights in such property.

83.     Defendants' conduct in connection with the Facility, the Tank, and the methyl methacrylate release, including but not limited to the venting of vapor, the activation of the Facility's overhead sprinkler and deluge system, the discharge of sprinkler runoff, the imminent threat of further release, and the displacement caused by mandatory-evacuation orders directly arising from Defendants' conduct, has substantially and unreasonably interfered with Plaintiffs' and the Classes' use and enjoyment of their property.

84.     The interference is substantial. Plaintiffs and the Classes were forced to leave their property, could not use their property, could not enter their property, and were denied entry to their property for periods of up to five days while mandatory-evacuation orders

**CLASS ACTION COMPLAINT**

were in effect.

85.     The interference is unreasonable. The gravity of the harm to Plaintiffs and the Classes, including total loss of use of property for periods ranging up to five days and the exposure and feared exposure to a hazardous chemical released into the surrounding air during that period, far outweighs any social utility of Defendants' conduct in operating a bulk methyl methacrylate storage system without adequate process-safety controls in a residential corridor.

86.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the Classes have suffered, and continue to suffer, damages in an amount to be proven at trial, including without limitation: evacuation and displacement costs; lodging, food, transportation, and incidental expenses; lost wages and lost business income; loss of use and enjoyment of property; property damage and diminution in property value; medical expenses incurred in connection with exposure or feared exposure; the reasonable costs of medical monitoring for the latent effects of exposure to methyl methacrylate; school-closure-related costs; and emotional distress.

87.     Defendants' conduct giving rise to the private nuisance was carried on with malice within the meaning of California Civil Code section 3294(c)(1), and was authorized, ratified, and approved by Defendants' officers, directors, and managing agents within the meaning of California Civil Code section 3294(b), as set forth in the allegations of industry-wide knowledge and Defendants' conscious disregard above. Plaintiffs and the Classes are entitled to punitive and exemplary damages on this cause of action.

## THIRD CAUSE OF ACTION

*Trespass*

*(By Plaintiffs and the Classes Against All Defendants)*

88.     Plaintiffs reallege and incorporate by reference each and every allegation set forth above as if fully set forth herein.

89.     Plaintiffs and the members of the Proposed Classes own or lawfully possess real property within the mandatory-evacuation zones and within the dispersion area of the

25

**CLASS ACTION COMPLAINT**

methyl methacrylate vapor released from the Facility, or are business owners or operators within the same.

90.    Defendants caused methyl methacrylate vapor, sprinkler runoff carrying methyl methacrylate, and other tangible products of the venting and release at the Facility to physically enter and remain upon Plaintiffs' and the Proposed Classes' property. The intrusion was the foreseeable and direct consequence of Defendants' conduct in storing methyl methacrylate at the Facility in the manner alleged herein.

91.    The intrusion caused physical damage to Plaintiffs' and the Proposed Classes' property, including chemical deposition on surfaces and soils, contamination of structures, and impairment of the use and value of the property.

92.    The intrusion was without consent of Plaintiffs or the members of the Proposed Classes.

93.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the members of the Proposed Classes have suffered, and continue to suffer, damages in an amount to be proven at trial, including without limitation: evacuation and displacement costs; lodging, food, transportation, and incidental expenses; lost wages and lost business income; loss of use and enjoyment of property; property damage and diminution in property value; medical expenses incurred in connection with exposure or feared exposure; the reasonable costs of medical monitoring for the latent effects of exposure to methyl methacrylate; school-closure-related costs; and emotional distress.

94.    Defendants' trespass was carried on with malice within the meaning of California Civil Code section 3294(c)(1), in that Defendants caused methyl methacrylate vapor and tangible products of the venting and release to enter Plaintiffs' and the proposed Classes' property knowing that the release was a foreseeable consequence of their decision to store bulk quantities of methyl methacrylate without adequate process-safety controls in a residential corridor. Defendants' conduct was authorized, ratified, and approved by Defendants' officers, directors, and managing agents within the meaning of California Civil Code section 3294(b). Plaintiffs and the Classes are entitled to punitive and

26

**CLASS ACTION COMPLAINT**

exemplary damages on this cause of action.

## FOURTH CAUSE OF ACTION

*Negligence, Including Negligence Per Se*

*(By Plaintiffs and the Classes Against All Defendants)*

95.    Plaintiffs reallege and incorporate by reference each and every allegation set forth above as if fully set forth herein.

96.    Defendants owed a duty of reasonable care to Plaintiffs, to members of the Proposed Classes, and to all foreseeable persons within the dispersion radius and the blast radius of the Facility, including a duty to design, site, construct, operate, maintain, monitor, and inspect the Facility, the Tank, and the bulk methyl methacrylate storage system in a manner reasonably calculated to prevent the foreseeable risk of chemical release, fire, explosion, or vapor exposure.

97.    Defendants breached that duty by, among other things: (a) failing to maintain a functional isolation and off-loading valve on the Tank; (b) failing to maintain a functional cooling system capable of holding the Tank at the chemical's recommended storage temperature; (c) failing to maintain adequate concentrations of polymerization inhibitor and dissolved oxygen in the stored liquid; (d) failing to monitor the Tank's temperature with alarms calibrated to trigger before the chemical reached temperatures associated with inhibitor failure; (e) failing to train operators to recognize and respond to temperature excursions; (f) failing to implement and maintain a Process Safety Management program adequate to the hazard; (g) failing to implement and maintain a California Accidental Release Prevention Program adequate to the hazard; (h) failing to maintain the Facility in compliance with applicable provisions of the California Fire Code, the Hazardous Materials Business Plan program, and applicable local hazardous-materials ordinances; (i) failing to limit the quantity of methyl methacrylate stored at the Facility to a quantity appropriate to the residential corridor; and (j) failing to remediate prior regulatory citations and findings concerning safety violations at the Facility.

/ / /

27

**CLASS ACTION COMPLAINT**

98. Defendants' conduct also constitutes negligence per se. To the extent applicable to Defendants' operations at the Garden Grove facility, Defendants violated statutes and regulations including, without limitation, the California Accidental Release Prevention Program, Health and Safety Code section 25531 et seq., and California Code of Regulations, title 19, section 2735.1 et seq., the California Fire Code, including the chapters governing hazardous materials and flammable and combustible liquids; the Hazardous Materials Business Plan program, Health and Safety Code section 25500 et seq.; and the local Certified Unified Program Agency requirements administered, as to the Facility, by the Orange County Health Care Agency, Environmental Health Division, pursuant to California Health and Safety Code section 25404 et seq.Each of these statutes and regulations was designed in whole or in part to prevent the kind of harm suffered by Plaintiffs and the Classes, and Plaintiffs and the members of the Proposed Classes are within the class of persons these statutes and regulations were designed to protect.

99. Defendants' breaches were the actual and proximate cause of Plaintiffs' and the members of the proposed Classes' injuries. But for Defendants' breaches, the Tank would not have overheated, the valve would have allowed safe off-loading, the cooling system would have held the chemical at safe temperatures, the evacuation would not have been ordered, and Plaintiffs and the members of the proposed Classes would not have been displaced or exposed.

100. As a direct and proximate result of Defendants' conduct, Plaintiffs and the members of the proposed Classes have suffered, and continue to suffer, damages in an amount to be proven at trial, including without limitation: evacuation and displacement costs; lodging, food, transportation, and incidental expenses; lost wages and lost business income; loss of use and enjoyment of property; property damage and diminution in property value; medical expenses incurred in connection with exposure or feared exposure; the reasonable costs of medical monitoring for the latent effects of exposure to methyl methacrylate; school-closure-related costs; and emotional distress.

/ / /

28

**CLASS ACTION COMPLAINT**

101.    Defendants' negligence rose to the level of malice within the meaning of California Civil Code section 3294(c)(1). Defendants' conduct in storing tens of thousands of gallons of methyl methacrylate, with documented knowledge of the chemical's thermal-runaway hazards and of the engineering controls required to manage those hazards, while operating with an inoperable off-load valve, a compromised cooling system, and an inadequate process-safety management program, constituted despicable conduct carried on with a willful and conscious disregard of the rights and safety of Plaintiffs and the proposed Classes. As alleged above, Defendants' officers, directors, and managing agents had advance knowledge of the unfitness of the conditions at the Facility and authorized, ratified, and approved those conditions within the meaning of California Civil Code section 3294(b). Plaintiffs and the Classes are entitled to punitive and exemplary damages on this cause of action.

## FIFTH CAUSE OF ACTION

*Strict Liability for Ultrahazardous Activity*

*(By Plaintiffs and the Classes Against All Defendants)*

102.    Plaintiffs reallege and incorporate by reference each and every allegation set forth above as if fully set forth herein.

103.    The bulk storage of tens of thousands of gallons of methyl methacrylate, an extraordinarily flammable, self-polymerizing monomer with a flash point near freezing, in close proximity to dense residential housing, schools, parks, and businesses, is an ultrahazardous activity for which strict liability attaches under California law.

104.    The activity presents a high degree of risk of harm to the persons and property of others. Public officials, on the public record, stated during the incident that failure of the Tank was inevitable and that the incident was the most significantly dangerous event in the on-scene division chief's 32-year career.

/ / /

/ / /

/ / /

29

**CLASS ACTION COMPLAINT**

105. The likelihood that the harm will be great is high. The foreseeable failure modes included a release of thousands of gallons of toxic chemicals into a residential corridor and a thermal-runaway explosion implicating two additional adjacent storage tanks.

106. The risk cannot be eliminated by the exercise of reasonable care. The intrinsic self-polymerizing, exothermic chain reaction of methyl methacrylate, once the polymerization inhibitor is depleted, cannot be stopped by ordinary care and cannot be reliably halted by emergency response.

107. The activity is not a matter of common usage. The bulk storage of methyl methacrylate at quantities approaching tens of thousands of gallons is conducted by a small number of specialized industrial operators and is not in common use.

108. The activity is inappropriate to the place where it is carried on. The Facility is located immediately adjacent to dense residential housing, schools, and commercial corridors in Orange County, California.

109. The value of the activity to the community is outweighed by its dangerous attributes. The harm to Plaintiffs, members of the proposed Classes, and the affected communities, including the displacement of tens of thousands of residents, is grossly disproportionate to any community benefit from the storage of bulk methyl methacrylate in this residential corridor.

110. Defendants engaged in this ultrahazardous activity for their own commercial benefit. They are strictly liable for the harm to Plaintiffs and the members of the proposed Classes proximately caused by the activity, without regard to fault.

111. As a direct and proximate result of Defendants' conduct, Plaintiffs and the Classes have suffered, and continue to suffer, damages in an amount to be proven at trial, including without limitation: evacuation and displacement costs; lodging, food, transportation, and incidental expenses; lost wages and lost business income; loss of use and enjoyment of property; property damage and diminution in property value; medical expenses incurred in connection with exposure or feared exposure; the reasonable costs of

30

**CLASS ACTION COMPLAINT**

medical monitoring for the latent effects of exposure to methyl methacrylate; school-closure-related costs; and emotional distress.

## SIXTH CAUSE OF ACTION

*Negligent Infliction of Emotional Distress, Direct Victim*

*(By Plaintiffs and the Classes Against All Defendants)*

112.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above as if fully set forth herein.

113.   Defendants owed Plaintiffs and the members of the proposed Classes a duty of care, the breach of which has caused emotional distress as a foreseeable and direct consequence. Defendants' conduct directly threatened the physical safety of Plaintiffs and the members of the proposed Classes through the sustained, publicly acknowledged threat of explosion and toxic chemical release from the Facility.

114.   Defendants breached the duty owed to Plaintiffs and the members of the proposed Classes as alleged above, including in the negligence allegations set forth herein.

115.   As a direct and proximate result of Defendants' conduct, Plaintiffs and the members of the proposed Classes have suffered, and continue to suffer, serious emotional distress, including fear, anxiety, sleeplessness, and the foreseeable distress of being ordered to leave home in the face of a publicly acknowledged threat of explosion and toxic release of unknown duration.

116.   As a direct and proximate result of Defendants' conduct, Plaintiffs and the Classes have suffered, and continue to suffer, damages in an amount to be proven at trial, including without limitation: evacuation and displacement costs; lodging, food, transportation, and incidental expenses; lost wages and lost business income; loss of use and enjoyment of property; property damage and diminution in property value; medical expenses incurred in connection with exposure or feared exposure; the reasonable costs of medical monitoring for the latent effects of exposure to methyl methacrylate; school-closure-related costs; and emotional distress. Defendants' conduct giving rise to the negligent infliction of emotional distress was carried on with malice within the meaning

31

**CLASS ACTION COMPLAINT**

of California Civil Code section 3294(c)(1), and was authorized, ratified, and approved by Defendants' officers, directors, and managing agents within the meaning of California Civil Code section 3294(b), as set forth in the allegations of industry-wide knowledge and Defendants' conscious disregard above. Plaintiffs and the Classes are entitled to punitive and exemplary damages on this cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Tran, on behalf of himself and all others similarly situated, and Plaintiff Drippys, on behalf of itself and all others similarly situated, pray for judgment against Defendants, and each of them, as follows:

A.    For general damages according to proof;

B.    For special damages according to proof, including without limitation evacuation and displacement costs; lodging, food, transportation, and incidental expenses; lost wages and lost business income; loss of use of real and personal property; loss of enjoyment of property; property damage and diminution in property value; medical expenses; and school-closure-related costs;

C.    For an order certifying this action as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiffs as Class Representatives, and appointing the undersigned counsel as Class Counsel under Federal Rule of Civil Procedure 23(g);

D.    For preliminary and permanent injunctive relief, that Defendants, before resuming ordinary operations at the Garden Grove Facility involving the bulk storage of methyl methacrylate or other flammable or hazardous chemicals, bring the Facility into full compliance with all applicable process-safety, hazardous-materials, and emergency-planning requirements, and enjoining Defendants from operating the Facility in a manner that creates an unreasonable risk of catastrophic release, fire, or explosion in the surrounding residential corridor;

**CLASS ACTION COMPLAINT**

E.   For an order establishing a court-supervised medical-monitoring program for members of the proposed Class;

F.   For punitive and exemplary damages pursuant to California Civil Code section 3294 on the First Cause of Action (Public Nuisance), the Second Cause of Action (Private Nuisance), the Third Cause of Action (Trespass), the Fourth Cause of Action (Negligence), and the Sixth Cause of Action (Negligent Infliction of Emotional Distress), in an amount sufficient to punish Defendants for their malicious and despicable conduct and to deter similar conduct in the future;

G.   For prejudgment interest as allowed by law;

H.   For costs of suit;

I.   For reasonable attorneys' fees as allowed by statute, contract, or the common-fund doctrine; and

J.   For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable, pursuant to Federal Rule of Civil Procedure 38.

DATED: May 27, 2026                          **PARRIS LAW FIRM**

_____

R. Rex Parris
Alexander R. Wheeler
Jason P. Fowler
Edmond L. Guidry, IV
*Attorneys for Plaintiffs
and the Proposed Class*

33

**CLASS ACTION COMPLAINT**